**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

MALOW M. MAYEK,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
SERGEANT JOSEPH A. RODARTE, in his individual capacity,
DOUGLASS WATSON, in his individual capacity, and
JAMES MARTINEZ, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Malow M. Mayek, by and through his attorneys David Lane and Reid Allison of

KILLMER, LANE & NEWMAN, LLP, and Joseph J. Perkovich, respectfully alleges for his

Complaint and Jury Demand as follows:

## I.      INTRODUCTION

      1.      On August 22, 2018, Defendant Sergeant Joseph Rodarte, along with three other

officers employed by the Denver Police Department ("DPD") whom Rodarte supervised,

forcibly arrested Plaintiff, an unarmed seventeen-year-old, 120-pound juvenile. Under the

circumstances described herein, the DPD's written use of force policy called for no force. But

Defendant Rodarte struck Plaintiff six times with a metal baton, and Defendants Douglass

Watson and James Martinez each tased Mr. Mayek. Then, as another officer handcuffed

Plaintiff's wrists behind his back as Mr. Mayek writhed and shrieked on the pavement from his

blunt force injuries, Defendant Rodarte applied DPD-issue nunchucks as a vice upon Plaintiff's

right lower leg, repeatedly twisting and torqueing the device while jerking Plaintiff's leg skyward.

2.      Plaintiff suffered a critical head injury, a fractured nose, and fractures of his right tibia and right fibula, coupled with facial lacerations requiring sutures above his right eyebrow. He was hospitalized for two days with life threatening injuries requiring surgery to insert a rod into the cavity of his right tibia.

3.      The District Attorney for the State of Colorado's Second Judicial District investigated the arrest. It concluded that Defendant Rodarte "used an extreme amount of unjustified force against" Plaintiff. On October 24, 2018, the Denver District Attorney charged Sergeant Rodarte with second degree assault for unlawfully, feloniously, and recklessly causing serious bodily injury to Plaintiff by means of a deadly weapon. The Denver District Attorney ultimately tried Sergeant Rodarte on two assault counts and, on October 2, 2019, a Denver City & County Court jury acquitted him.

4.      Defendant Rodarte's violence against Plaintiff was consistent with his well-established conduct in a DPD uniform, as he had been the subject of twenty known excessive force complaints during his time on the force, complaints that he met essentially with impunity.

5.      Defendant Rodarte could blithely ignore the routinely lodged excessive force complaints against him because Defendant City and County of Denver ("Denver") has fostered an environment and culture of law enforcement brutality and deliberate indifference to the constitutional and statutory rights of citizens and residents. Defendant Rodarte's senseless and potentially lethal beating of Plaintiff is just one such instance in the well-known but unaddressed pattern and practice of the DPD.

6.      Plaintiff's injuries are a result of all Defendants' gratuitous aggression that is not merely unchecked by the Defendant Denver's policies and practices driving the operation of its police department. Over the course of decades, the Defendant Denver has condoned Defendant Rodarte's brutal excesses and the similar abuses of countless other officers like him.

## II.      JURISDICTION AND VENUE

7.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

8.      Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

9.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## III.      PARTIES

10.      At all times relevant to this Complaint, Plaintiff Malow M. Mayek was a citizen of the United States of America and a resident of the State of Colorado.

11.      At all relevant times, Defendants Joseph Rodarte, Douglass Watson, and James Martinez ("Individual Defendants") were citizens of the United States and residents of the State of Colorado and were acting under color of state law in their capacities as law enforcement officers employed by the Denver Police Department ("DPD"). The Individual Defendants are sued in their individual capacities.

12.      Defendant City and County of Denver ("Denver") is a Colorado municipal corporation and is the legal entity responsible for itself and for DPD.

## IV.     FACTUAL ALLEGATIONS

**A.     SERGEANT RODARTE VIOLENTLY ATTACKED PLAINTIFF, AN UNARMED TEENAGER, CAUSING LIFE-THREATENING INJURIES AND LASTING HARM**

*A1.  Plaintiff, a Teenager, Had Taken LSD and, While Severely Hallucinating, Wandered From His Home into the Community.*

13.     On the day he was brutalized by Defendants, Plaintiff Malow M. Mayek was seventeen years old and living in his mother's apartment. On the morning of August 22, 2018, alone in his home, he took a quantity of LSD. Plaintiff was a novice user of this hallucinogen. He became disoriented and grew overheated, which prompted him to leave his home and wander into the community.

14.     In a span of about twenty minutes late that morning, five individuals placed calls to 9-1-1 describing a tall, very thin black male, alerting the authorities that the he (i) was "very high, or has something wrong," and was screaming profanities near a children's playground in Ruby Hill Park at 1700 S. Pecos St., (ii) was either drunk or on drugs, spinning in circles and dancing in the street, and not appearing to have a weapon, (iii) was, again, either drunk or on drugs, spinning in circles/dancing in the street, and unarmed, (iv) was being chased by a white or Hispanic male brandishing a gun at the individual, running eastbound on Warren Ave., and (v) was "deranged," yelling and screaming, "I am God," apparently intoxicated on alcohol or narcotics, and, apparently unarmed, running up and down the alley behind 2240 S. Jason St.

15.     The first DPD Officer to establish contact with Plaintiff was Defendant James Martinez, who encountered Plaintiff walking on Warren Ave. toward S. Jason St. Defendant Martinez yelled to Plaintiff, "Yo! Come over here man!" Plaintiff responded, "I'm not going anywhere!" and proceeded to run away, whereupon Defendant Martinez pursued him on foot.

16.     At the same time, driving northbound on S. Jason St. was Defendant Sergeant Joseph Rodarte, a 20-year veteran of the DPD, aged 50 years, standing 5'10" and weighing 250

pounds. Defendant Rodarte stopped his vehicle near 2240 S. Jason St. in order to intercept Plaintiff, the 120-pound teenager. In radio communication with police dispatch, Defendant Rodarte had expressed around this time that the subject (Plaintiff) faced no criminal charges.

### A2.  Despite twenty excessive force complaints, Defendant Rodarte was in uniform, on duty.

17.     Prior to his encounter with Plaintiff, Sergeant Joseph Rodarte is reported to have been the subject of twenty (20) discrete excessive force complaints. In all but one of those 20 complaints, DPD's Internal Affairs Bureau ("IAB") cleared him.

18.     Twice in 2017, the DPD had suspended Defendant Rodarte—once for violating the department's use of force procedures and another time for using a federal crime database for personal reasons.

19.     A November 6, 2017 disciplinary letter reflects that Defendant Rodarte, in his capacity as supervising officer, authorized another officer to discharge his taser against a suspect even though the suspect presented no threat. Defendant Rodarte was suspended without pay for ten days for that incident.

20.     Despite Defendant Rodarte's known history with using excessive force, Defendant Denver had maintained him as a trainer on use of force and crisis intervention for its other officers.

### A3.  Defendants Rodarte, Martinez, and Watson brutally and unreasonably attacked Plaintiff, a patently disoriented and terrified, 120-pound minor, with DPD-issue baton, nunchucks, and Tasers.

21.     As Plaintiff approached Defendant Rodarte's patrol car, he encountered the sergeant standing several feet away from his vehicle. Facing Defendant Rodarte, and with his back turned to the fast approaching Defendant Martinez, Plaintiff stopped in his tracks.

Defendant Martinez then kicked Plaintiff from behind in an attempt to bring Plaintiff to the ground.

22.     Plaintiff lurched forward, shrieked, and bolted away from the two officers into the parking lot of Loris & Eddie's Auto Repair. The two officers chased him on foot. Meanwhile, Officers Isaac Ocampo and Defendant Watson also approached the mechanics' garage on foot.

23.     Plaintiff entered the mechanics' garage, and seconds later he reversed course and exited the garage, sprinting aimlessly in the other direction. By then, Defendant Martinez was standing near the entrance/exit to the garage with his Taser drawn. Defendant Martinez stuck out his leg to trip him as he exited the garage, causing Plaintiff to stumble forward into a somersault.

24.     Plaintiff tumbled end over end on the concrete toward Defendant Rodarte, who was crouched in a batter's stance with his baton (also known as "Rapid Containment Baton" or "RCB") in his hands, cocked to swing at Plaintiff.

25.     Defendant Rodarte, with his first batter's swing of his baton, struck Plaintiff in his face, breaking Plaintiff's nose and causing Defendant Martinez to let out an "Oh!," in apparent surprise at Defendant Rodarte's action or dismay with its excess. Plaintiff crumpled to the ground. Defendant Rodarte moved toward Plaintiff and then swung his baton down at him again, apparently striking Plaintiff's right arm.

26.     Defendant Rodarte circled to the side of the seated Plaintiff and then delivered two more baton strikes, cracking the device against Plaintiff's lower right leg.

27.     Defendant Rodarte then repeatedly yelled at the slight, severely injured, teenager: "lay down!" and "on your belly!"

28.     Plaintiff's body listed to his left, toppling to the pavement. Officer Ocampo stepped over to Plaintiff's body to straddle it as he grabbed Plaintiff's right wrist and began to

place it behind his back in order to cuff his wrists together. Plaintiff, still hallucinating and now in excruciating pain, moaned unintelligibly and began to sit up. Defendant Watson hovered near Plaintiff as Officer Ocampo began to apply the handcuffs and then stood over Plaintiff and pressed on his back while Officer Ocampo continued his effort.

29.     Defendant Rodarte then approached Plaintiff, who was seated on the ground and grasped by both Officers Ocampo and Watson.

30.     As Plaintiff saw Defendant Rodarte approach him, once again with the baton cocked to strike him, Plaintiff attempted to rise from his seated position on the concrete. Plaintiff let out a terrified scream, again. As he started his attempt to flee the approaching baton strike, Defendant Rodarte reached striking distance and hit Plaintiff twice more, on the leg.

31.     Plaintiff again collapsed to the pavement, then writhed and rolled across the ground briefly, for about five seconds. Though Mr. Mayek was obviously no threat to anyone, seriously injured, and surrounded by four large officers, any one of whom could have easily controlled him by going hands-on, Defendants Martinez and Watson asked to tase Plaintiff and Defendant Rodarte ordered them to tase him. Defendants Martinez and Watson each fired their Tasers at Plaintiff.

32.     Officer Ocampo then resumed his effort to handcuff Plaintiff on the pavement. With Plaintiff on the concrete and incapacitated while Officer Ocampo handcuffed his wrists, Defendant Rodarte placed his left boot on Plaintiff's upper right leg and removed the DPD-issue nunchucks (also known as "Orcutt Police Nunchaku" or "OPN") from his belt.

33.     Defendant Rodarte deployed the nunchucks around Plaintiff's right lower leg— the area he had twice struck with the baton seconds prior. Defendant Rodarte wrapped the nunchucks around Plaintiff's leg to create a vice-grip, forcing the lower portion just above

Plaintiff's ankle to bend at an unnatural forty-five-degree angle away from the upper portion of his lower leg.

34.     Plaintiff repeatedly screamed in extreme pain, as Defendant Rodarte tightened the nunchucks-vice on his ankle and repeatedly pulled Plaintiff's leg and body upward toward him as Officer Ocampo slowly finished handcuffing Plaintiff's wrists behind his back.

35.     Defendant Rodarte then moved to the side, dragging Plaintiff slightly by pulling his leg while twisting and torqueing the nunchucks repeatedly, inflicting further pain.

36.     Throughout Defendant Rodarte's breathtakingly unreasonable infliction of excruciating pain, neither Defendant Watson nor Defendant Martinez intervened to stop it, though each had ample opportunity to do so.

37.     As Officer Ocampo finished cuffing Plaintiff, Defendant Rodarte released the nunchucks from around Plaintiff's leg while rising up from his crouched stance and sharing a wide smile and knowing glance with Defendant Martinez.

38.     At no point during the officers' pursuit and apprehension of Mr. Mayek did he present any threat to the officers or anyone else.

39.     Each individual officer was much bigger and stronger than the then-17-year-old Plaintiff, and yet Officer Ocampo was the only officer who attempted to simply use hands-on force to handcuff the minor. Rather than aid Officer Ocampo in this task, Defendants Rodarte, Watson, and Martinez chose to use extreme and completely unreasonable amounts of force against Mr. Mayek.

40.     Bodycam of Defendants brutalizing Mr. Mayek can be viewed here:

https://www.dropbox.com/sh/9b1z4mmt3mzk8a5/AADp4BGKCiJuvLWvv6S4hLGIa?dl=0

### A4. Plaintiff, ambulanced to Denver Health with life threatening injuries, underwent various treatments, including surgery to implant a rod in his tibia.

41.     From the scene of his arrest midday on August 22, Plaintiff was ambulanced to Denver Health. The emergency medical technicians attending to Plaintiff noted his injuries and his hallucinatory state. Denver Health gave Plaintiff critical care for his severe injuries inflicted by DPD that, according to his treating physician, could have caused death if left unattended.

42.     Before releasing him on August 24, Denver Health treated Plaintiff for, inter alia, the following:

a)  displaced comminuted fractures of both the shafts of his right tibia and his right fibula requiring surgical implantation of an intramedullary nail in the right tibia (i.e., a rod forced into the central cavity of the tibia bone shaft);

b)  left-sided comminuted nasal bone fracture with a left nasal mucosa laceration requiring sutures;

c)  laceration on his forehead near his right temple requiring two sutures for closure;

d)  head injury on the left side of his scalp involving a hematoma;

e)  and encephalopathy potentially from traumatic brain injury.

43.     Shortly after his arrival, Plaintiff's treating nurse needed to apply a long splint in order to keep his lower right leg fractures from becoming open fractures (breaking through the skin).

44.     After obtaining the sutures for the two lacerations on his head, Plaintiff underwent surgery to implant the above-mentioned intramedullary nail in his right tibia.

### A5.     The District Attorney prosecuted Defendant Rodarte on three counts of assault.

45.     On October 24, 2018, the Denver District Attorney opened its case against Defendant Rodarte, charging him with assault in the second degree for unlawfully, feloniously,

and recklessly causing serious bodily injury to Plaintiff by means of a deadly weapon (baton), under C.R.S. 18-3-203(1)(d)(F4), and later adding two further assault charges: in the second degree for the intent to cause bodily injury to another, unlawfully and feloniously causing bodily injury to Plaintiff by means of a deadly weapon (baton), under C.R.S. 18-3-203(1)(b); and in the third degree, for unlawfully, knowingly or recklessly, causing Plaintiff bodily injury, under C.R.S. 18-3-203(1)(a).

46.     At Defendant Rodarte's March 28, 2019 preliminary hearing in the Denver County Court, Senior Criminal Investigator John E. Davidson of the Denver District Attorney's Office testified that he reviewed DPD's use of force policy in connection with his factual investigation concerning the arrest of Plaintiff.

47.     Investigator Davidson stated that Plaintiff, throughout the incident, demonstrated non-violent (or defensive) resistance rather than any manner of resistance that could properly engage a DPD officer's use of force, including the use of what is known as an impact tool or device, such as a baton or nunchucks.

48.      Investigator Davidson testified that forceable resistance is reserved for use in an active aggression situation, such as when a subject is engaging an officer in a physical altercation or when it is necessary to intervene as a suspect assaults someone else. The investigator further stated that Plaintiff did not present any behaviors that could qualify as forceable resistance and that thereby could properly call for the use of force.

49.     Furthermore, the arresting officers' conduct corroborated the fact that Plaintiff did not present an active aggression situation, given that Defendant Rodarte expressed to police dispatch that the subject faced no criminal charges and that none of the officers unholstered there

service revolver at any point in the sequence of events. Defendant Martinez stated in his interview with Investigator Davidson that at no time during this incident did he fear for his life.

50.     In this context, Investigator Davidson identified that Defendant Rodarte violated the DPD's written use of force policies in his use of the baton and nunchucks against Plaintiff.

51.     The District Attorney took the case to trial and Mr. Rodarte's jury acquitted him on October 2, 2019.

52.     In May 2020, Defendant Rodarte resigned from DPD, before he could be terminated for his attack on Mr. Mayek, as well as for his orders to Defendants Martinez and Watson to tase Mr. Mayek. Defendants Martinez and Watson were disciplined for unreasonably tasing Mr. Mayek while he was under control and not threatening anyone. Each officer was suspended for ten days.

**B.     DEFENDANT CITY OF DENVER, THROUGH THE CULTURE AND PRACTICES PROMOTED IN ITS POLICE DEPARTMENT, HAS LONG-FOSTERED AND UPHELD THE USE OF EXCESSIVE FORCE AGAINST DENVER'S CITIZENS**

*B1.     Defendant Denver's policies, customs, and practices endorsing, by both official action and inaction, the routine use of excessive force animated the violence against Plaintiff and the resulting violations of his constitutional rights.*

53.     Defendant Denver has a policy, custom, and practice of excessive use of force, epitomized in Defendant Rodarte's more than twenty-year career with DPD. Year-by-year, Defendant Rodarte accumulated numerous excessive force complaints but these never caused meaningful repercussions or censure. And, quite obviously, nothing Defendant Denver had previously done remedied Defendant Rodarte's known penchant for using excessive force, before he viciously beat Mr. Mayek. Over the course of Defendant Rodarte's career, Denver made very clear to him that his well-known practice of excessive force was acceptable; indeed, he reached the rank of Sergeant in the department.

54.     Beyond its obligation to impose meaningful discipline on its personnel for their unconstitutional conduct, Defendant Denver has the responsibility to properly train and supervise its law enforcement officers in complying with constitutional requirements during encounters with citizens. Systemically, Defendant Denver has failed in this responsibility and is to blame for enabling and encouraging the conduct of its officers in beating and tasing Mr. Mayek.

55.     Despite written use of force policies, the routine, often flagrant disregard of these policies without meaningful discipline or other consequences for the transgressing officer have firmly rooted the unconstitutional behavior of officers like the Individual Defendants in the day-to-day conduct of DPD in its encounters with the citizens of Denver.

56.     Among other necessary training, Defendant Denver failed to properly train its officers on the appropriate use of force against a person who is not suspected of any crime and who only runs from officers, without threatening any person. Similarly, Denver failed to train its officers that they may not constitutionally tase someone who could be easily controlled by an officer going hands-on. Finally, Defendant Denver failed to adequately train its officers on their duty to intervene in fellow officers' use of obviously excessive force—including the infliction of severe pain without legitimate justification, while the subject is controlled by other officers.

57.      Defendant Denver has cultivated an environment and culture of law enforcement brutality and deliberate indifference to the constitutional and statutory rights of citizens and residents. This context enabled the Individual Defendants' attack on Plaintiff. This assault was foreseeable and fully in keeping with a long-established pattern of behavior from DPD officers.

58.     Defendant Denver has had ample notice of widespread, persistent excessive force-related constitutional violations. But it has failed to act meaningfully and bears responsibility in this action for the Individual Defendants' extreme violence.  Defendant Denver has plainly failed

to develop and instill adequate training to DPD officers on complying with the requirements of the Fourth Amendment, including lawful seizure and how to conduct a lawful seizure without the use of excessive force. Defendant Denver has persistently failed to respond to the myriad, unmistakable indications of this failure.

59.     Indeed, recent events have made clear that Defendant Denver's customs and practices in this regard remain as entrenched as ever. During the widespread protests against police violence that were held in May and June of 2020, DPD Officers routinely fired tear gas and rubber bullets at peaceful protestors. This outrageous police violence (committed in response to peaceful protests against police violence) was so pronounced that United States District Court Judge Brooke Jackson issued a temporary injunction, prohibiting DPD's use of chemical agents and projectiles on peaceful protestors. Like Mr. Mayek and many of the other cases against Denver officers over the years, non-violent subjects were met with Defendant Denver's overwhelming and patently unreasonable force, until a federal judge intervened to stop it.

60.     For the sake of continuity and brevity, facts in support of and relevant to Plaintiff's claim pursuant to *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978), are included in a supplemental **Exhibit A** filed contemporaneously with this Complaint.  All statements of fact included in **Exhibit A** are hereby incorporated into this Complaint by reference as though fully set forth herein.

**B2. The neutered Internal Affairs Bureau has historically exacerbated the negative consequences from Defendant Denver's grossly deficient training of law enforcement personnel, thereby perpetuating unconstitutional misconduct such as the excessive force visited upon Plaintiff.**

61.     On the profoundly dysfunctional backdrop made clear by the decades-worth of egregious uses of force detailed in **Exhibit A**, Defendant Denver has failed to change the way it trains or supervises personnel despite the steady stream of homicides and other abhorrent violent

13

tragedies at the hands of its law enforcement officers. In every such instance of excessive force, unmistakable deficiencies in its training are apparent, highlighting that this violence and its attendant corrosion in the trust of the people of Denver is wholly preventable. Yet Defendant Denver has refused to remedy its unconstitutional regimen. Defendant Denver, year-by-year, has not only demonstrated its deliberate indifference to the rights of its community, it has shown that it is unrepentantly and recalcitrantly indifferent to these rights and the consequences of its policies for the lives of its people.

62.     The following subject areas, among others, exemplify Defendant Denver's longstanding training deficiencies: (i) the failure to utilize regular stress inoculation training (which foreseeably leads to officers becoming over-adrenalized during stressful situations and grossly overreacting to any actual or perceived resistance/noncompliance); (ii) the failure to teach appropriate de-escalation tactics (such as the use of words in lieu of force to defuse potentially volatile situations); (iii) the failure to train and require officers to timely, accurately, or truthfully report their on-the-job conduct (which foreseeably causes officers to lie about their conduct and the conduct of their fellow officers without being held accountable); (iv) the minimization of the seriousness and danger of excessive force, and the actual encouragement of such use;[1] (v) the failure to require its officers to preserve evidence relating to allegations of misconduct (which foreseeably enables officers to evade accountability for their wrongdoing);

---

[1] The Office of Independent Monitor details how one of the law enforcement officials responsible for *training* in the use of force actually wanted to use the video of the excessively forceful killing of Mr. Marshall "just for training" because he believed "that it was well done." City and County of Denver Office of the Independent Monitor, *The Death of Michael Marshall*, *an Independent Review*, pp. 44-45, n.434 (2018), available at: https://www.denvergov.org/content/dam/denvergov/Portals/374/documents/OIM%20Marshall%20Report.pdf. The Independent Monitor, after exhaustively reviewing the evidence, concluded that the facts showed "how faulty [the] former trainer's conclusion [was] that the force was 'done the way we want it to be done.'"

and (vi) the failure to appropriately discipline officers who engage in misconduct (which foreseeably emboldens officers to violate citizens' rights and the law).

63.     Denver has been on notice for more than a generation that brutality is widespread and that particular reforms need to be implemented.

64.     Defendant Denver has failed to maintain a meaningful system of review of officer conduct relating to the withholding of knowledge or provision of false information with regard to investigations into misconduct by fellow officers. This failure to identify and track such officers, including those supervised by or otherwise directly aware of the misconduct of Defendant Rodarte over the course of his two decades with DPD, demonstrates further the deliberate indifference sustained in this history. The resulting "code of silence" is thus seen to enable the disregarding of virtually every element of the staggering number of excessive force complaints against Defendant Rodarte. This "code" explains, in significant part, how a sergeant may face a steady stream of excessive force complaints without ever facing meaningful disciplinary or supervisory consequences.

65.     Defendant Denver's refusal to identify and, at least intervene with (let alone discipline) those officers who perpetuate the "code of silence" presents yet another element of its overall deliberate indifference to the rights of Denver's population, and causes Denver police officers to believe that they can engage in misconduct, secure in the knowledge that their fellow officer will never provide evidence against them.

66.     Defendant Denver has an entrenched custom and practice of failing to discipline law enforcement personnel who unconstitutionally and excessively use force. Though it did so in this case, such discipline was levied only after years of not disciplining these and similarly-

situated officers—a passage of time that instilled in these Defendants a custom and culture of using severe and completely unreasonable force, as they did against Mr. Mayek.

67. As a direct and proximate result and cause of the wrongful conduct of Defendant Rodarte, Plaintiff suffered severe, life-threatening physical injuries and other harm and losses, entitling him to compensatory and special damages in amounts to be determined at trial. As a direct and proximate result and cause of the wrongful conduct of the Defendants, Plaintiff has suffered substantial emotional injuries, and other losses, entitling him to compensatory, economic and special damages, in amounts to be determined at trial.

**B3. Defendant Denver's longstanding refusal to remediate DPD's unconstitutional practices directly caused egregious violations of Plaintiff's rights and safety.**

68. It is the longstanding, widespread deliberately indifferent custom, habit, practice and/or policy of Defendant Denver to fail to supervise and to train officers in the rights of citizens to be free from unreasonable seizure and excessive force.

69. Defendants have done all of the acts described herein intentionally, knowingly, willfully, wantonly, maliciously and/or recklessly in disregard for Plaintiff's federally protected rights. Defendants have done these acts pursuant to preexisting, deliberately indifferent official custom, policy, practice, training, and supervision.

## V.      STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourth & Fourteenth Amendment Violation – Excessive Force
### (Against All Defendants)

70. Plaintiff hereby incorporates all other paragraphs of this Complaint, and the content of any and all exhibits attached hereto, as if fully set forth herein.

71. At all times relevant to the subject matter of this Complaint, Defendants Rodarte, Watson, and Martinez were acting under color of state law in their capacities as officers in the DPD and within the scope of their employment.

72. At the time when Plaintiff was seized, on August 22, 2018, Mr. Mayek had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

73. Plaintiff also had a constitutional right requiring officers to intervene to prevent their fellow officer's use of obviously excessive force.

74. Any reasonable law enforcement officer would have or should have known of these clearly established rights.

75. Defendant Rodarte's arrest of Plaintiff by, among other actions, violently striking his baton (also known as "Rapid Containment Baton" or "RCB"), against Mr. Mayek's face, against his right arm/side, twice against his right lower leg, and twice more against his left leg/side, used greater force than was reasonably necessary to effect the seizure.

76. Similarly, Defendants Watson and Martinez tasing Mr. Mayek while he was bloodied, dazed, and would have been very easily contained by any single one of the four officers present was much more force than was reasonable under the circumstances.

77. Further, Defendant Rodarte's violently applying his nunchucks (also known as "Orcutt Police Nunchaku" or "OPN") as a vice against Mr. Mayek's lower right leg, twisting, torqueing, and jerking his leg repeatedly, used greater force than was reasonably necessary to effect the seizure.

78. Defendants Watson and Martinez were able to intervene to prevent Defendant Rodarte from torturously wrenching Mr. Mayek's leg, but they did not do so.

79.     The Individual Defendants' excessive use of force caused extreme pain and injury to Plaintiff. Mr. Mayek suffered such pain and injury to his (i) face and head, including a nasal bone fracture and hematoma on his scalp, facial lacerations, and traumatic brain injury-induced encephalopathy, and (ii) his lower right leg, including displaced comminuted fractures of the right tibia and right fibula requiring the surgical implantation of an intramedullary nail in the right tibia.

80.     Defendants caused these potentially life-threatening injuries, which required emergency medical attention including extensive care involving sutures, surgery, and hospitalization.

81.     Plaintiff also suffered mental injury, including pain and suffering, humiliation, and other injuries, damages, and losses due to the Individual Defendants' actions. These injuries are not *de minimis*.

82.     The Individual Defendants conducted these actions, as set forth herein, intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights, which entitles Mr. Mayek to punitive damages.

83.     The Individual Defendants used excessive force consistent and in accordance with custom, policy, practice, and training provided, promulgated, and otherwise communicated by Defendant City of Denver.

84.     Prior to the seizure of Plaintiff on August 22, 2018, Defendant Denver had established policies, customs and/or practices in violation of the Constitution.

85.     Defendant Denver developed and maintained law enforcement-related policies, customs, and/or practices exhibiting or resulting in a deliberate indifference to the Fourth and

Fourteenth Amendment-protected constitutional rights of persons in Denver, which proximately caused the violation of Plaintiff's constitutional rights.

86.     Defendant Denver failed to properly train and supervise its employees with regard to lawful seizure and lawful use of force.

87.     Defendant Denver has a duty to protect the constitutional rights of the members of the public from violations of those rights by members of the Denver Police Department.

88.     Defendant Denver could have and should have pursued reasonable methods for the training and supervising of its police officers, yet failed to do so. To the extent Defendant Denver provided training and supervision of its police force, the training and supervision was inadequate. This inadequacy resulted from a conscious or deliberate choice to follow a deficient course of action instead of adopting one from among various adequate alternatives.

89.     Given the duties and responsibilities of law enforcement officers who participate in providing safety and security for the public, including arrestees, Defendant Denver is liable to Plaintiff for its failure to deliver specialized law enforcement training and supervision. This need for specialized training and supervision is obvious and the inadequacy of Denver's actual training and supervision was far more than likely to result in the violation of constitutional rights such as those visited against Plaintiff at the Individual Defendants' hands, as set forth herein.

90.     Defendant Denver's policies, customs, or practices in failing to train and supervise its employees were the proximate cause of, and moving force behind, the violation of Plaintiff's constitutional rights, which caused Mr. Mayek damages as described herein.

## VI.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

(a)  Appropriate declaratory and other injunctive and/or equitable relief;

(b)  Compensatory and consequential damages, including damages for physical injury, emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)  All economic losses on all claims allowed by law;

(d)  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)  Attorneys' fees and the costs associated with this action, as well as expert witness fees, on all claims allowed by law;

(f)  Pre- and post-judgment interest at the lawful rate to the maximum extent allowed by law; and

(g)  Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this __th day of July 2020.

Killmer, Lane & Newman, LLP
/s/ David Lane
David Lane
Reid Allison
1543 Champa Street, Suite 400
Denver, Colorado 80202
Tel: (303) 571-1000
Fax: (303) 571-1001
dlane@kln-law.com
rallison@kln-law.com

Joseph J. Perkovich
PO Box 2171
New York, New York 10008

Tel: (212) 400-1660
j.perkovich@phillipsblack.org